This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**THE G.R. SEWELL DITCH, RIO ARRIBA BOARD OF COUNTY COMMISSIONERS, LA ASOCIACION DE LAS ACEQUIAS DEL RIO VALLECITOS, TUSAS Y OJO CALIENTE, DONALD GRIEGO and THOMAS GRIEGO,**

     Protestants-Appellants,

v.                                         **NO. 29,332**

**JOHN D'ANTONIO, JR., NEW MEXICO STATE ENGINEER,**

     Appellee,

and

**GILBERT GRAVES and DEBORAH GRAVES,**

     Applicants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Daniel A. Sanchez, District Judge**

Humphrey & Odé, P.C.
Mary E. Humphrey

Connie Odé
El Prado, NM

for Appellants G.R. Sewell Ditch,
Rio Arriba Board of County
Commissioners, La Asociacion
de las Acequias del Rio Vallecitos,
Tusas Y Ojo Caliente

Law Offices of Ted J. Trujillo
Ted J. Trujillo
Espanola, NM

for Appellants Donald Griego and Thomas Griego

New Mexico Office of the State Engineer
DL Sanders, Chief Counsel, Special Assistant Attorney General
Hilary Lamberton, Special Assistant Attorney General
Santa Fe, NM

for Appellee New Mexico State Engineer

O'Friel & Levy, P.C.
Pierre Levy
Santa Fe, NM

for Appellees Gilbert Graves and Deborah Graves

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

Appellants G.R. Sewell Ditch, Rio Arriba Board of County Commissioners, La Asociacion de las Acequias del Rio Vallecitos, Tusas y Ojo Caliente, Donald Griego

and Thomas Griego (Protestants), appeal the district court's approval of two permits originally granted by the State Engineer to Gilbert and Deborah Graves (Applicants). Pursuant to NMSA 1978, Section 72-5-4 (2001), Applicants published notice of their desire to change a point of diversion to a ditch located within a certain ten-acre section. At issue in this case is whether that notice was adequate to allow the district court to approve the change in diversion to one of two ditches within the indicated section. Because the notice was adequate to apprise the average citizen of the general purpose of the permits sought, we affirm.

**I.     BACKGROUND**

This appeal involves two permits granted pursuant to applications to change points of diversion and types of use of water filed by Applicants in October 2002. We first describe the ditches that irrigate Applicants' land. With this necessary background in place, we discuss the applications that were filed, the notice that was published, and the permits that were granted.

The Rio Tusas runs west to east across Applicants' property. Two ditches, Ditch W and the Tony Griego Ditch, are north of the river. Ditch W, a 1.3 mile-long ditch with no organizational structure, irrigates the northern portion of Applicants' property. Applicants are located at the tail end of the ditch and rarely receive water from it. The Tony Griego Ditch is a private ditch irrigating Applicants' property and

the Griegos' property. Its origin is on Applicants' property, and it continues on to and terminates on the Griegos' property. Prior to the granting of the permits at issue here, Applicants irrigated 2.6 acres from the Tony Griego Ditch and the Griegos irrigated 35.36 acres. At the time the permits were granted, Applicants and the Griegos were involved in litigation over the use and maintenance of the Tony Griego Ditch.

Two additional ditches, the Gurule Ditch and the Romero-Gurule Ditch, are located on Applicants' property to the south of the Rio Tusas. The Gurule Ditch arises near the western boundary of Applicants' property. It originates less than 500 feet upstream from the diversion for the Tony Griego Ditch. Applicants are the sole users of the Gurule Ditch, which is entirely contained within their property. There are no intervening diversions between the Gurule Ditch and the Tony Griego Ditch. The southern part of Applicants' property is irrigated by the Romero-Gurule Ditch. This ditch originates upstream, is used by several other persons, and terminates on Applicants' property.

On October 2, 2002, Applicants filed applications for three permits. Application Nos. 0701 and 0786 into 05130 (Ditch W application) was directed at changing the point of diversion of 42.04 acre-feet per year (afy) from Ditch W to the Tony Griego Ditch (it was later determined that Applicants had rights to only 28.686 afy from Ditch W). A second application was denied and is not the subject of this

4

appeal. The third application, No. 05131 into 4883 (Pond application), was directed at changing the place and purpose of use of 1.94 afy from irrigation of 1.66 acres of Applicants' land to a 0.346 acre pond for recreational fishing and storage for sprinkler irrigation.

Pursuant to statute, notice of the applications was published. The notice for the Ditch W application indicated that "the new point of diversion lies in the SW ¼ NE ¼ SW ¼ of Section 15, Township 28 North, Range 8 East." The notice also indicated that "[t]he new point of diversion is for the Tony Griego Ditch." Protestants concede that the two approved alternate points of diversion are located in the same ten acres. Our review of the record shows that this ten-acre section is entirely contained within Applicants' property.

Several persons filed protests. The permits were consolidated for hearing. On December 8, 2006, a hearing officer filed an order approving the Ditch W and Pond applications, subject to conditions. A de novo trial was held in district court and the same result was reached. We provide additional facts regarding the de novo trial where they are necessary in this Opinion.

**II.    DISCUSSION**

Protestants' arguments fall into two categories: (1) that the district court erred in granting relief that was not adequately described in the published notice; and (2)

that the district court's findings that the permits did not impair existing water rights, were not contrary to water conservation, and were not detrimental to the public welfare were not supported by sufficient evidence. We hold that notice was adequate and that the district court's findings were supported by substantial evidence. We also discuss separately various issues that were not preserved.

**A.     Statutory Notice**

Protestants argue that because the points of diversion granted in the Ditch W permit were different from what was requested, notice was not adequate and the applications should have been denied. Protestants make a similar argument with respect to the Pond application. The State Engineer responds that, under the relaxed rules of notice applicable here, Protestants had sufficient notice.

Before changing the point of diversion of appropriated water, an appropriator must file an application with the State Engineer. NMSA 1978, §§ 72-5-1 to -39 (1907, as amended through 2009). Notice of this application must be published according to statutory procedures set forth in Section 72-5-4, and must include all essential facts. Parties with standing can file protests. *See* § 72-5-5. If protests are filed, a hearing is held to determine whether the application should be granted. *See* §§ 72-5-5, -6, -23, -24.

6

Our leading case on adequacy of notice is *Nesbit v. City of Albuquerque*, 91 N.M. 455, 575 P.2d 1340 (1977). In *Nesbit*, a developer applied to change the zoning of a property from a plan allowing 83 condominiums to one allowing 287 efficiencies and apartments. *Id.* at 457, 575 P.2d at 1342. By statute, the developer was required to give notice at least fifteen days before a hearing about the change. *See id.* After the developer's request was denied by the City Planning Department, the developer appealed to the City Commission. *Id.* at 458, 575 P.2d at 1343. Timely notice was published. *Id.* However, the notice indicated only that the hearing was related to "a revised development plan for land on Indian Plaza Drive N.E." *Id.* Four neighbors opposed the zoning change at the hearing, and the City Commission denied the change. *Id.* The developer appealed to the district court and obtained a judgment directing the City Commission to grant the change. *Id.* No notice was given to any opposing parties of the district court's hearing. *Id.* The developer did not begin building until three years after the zoning change. *Id.* at 457, 575 P.2d at 1342. When construction began, some neighbors brought a motion to intervene in the three-year-old district court judgment ordering the City Commission to approve the change. *Id.* The court allowed the intervention and ruled that the lack of notice was a jurisdictional defect which rendered the action taken by the zoning authority void. *Id.* at 458, 575 P.2d at 1343.

The Supreme Court affirmed the district court, holding that the lack of notice rendered subsequent proceedings void. *Id.* at 458, 460, 575 P.2d at 1343, 1345. The foundation of this decision was due process. *See id.* at 457, 575 P.2d at 1342 (finding no error because of "the lack of due process apparent in the record"). The Court began by noting that "[l]ack of statutory notice is generally held to be a jurisdictional defect which renders the [administrative] action . . . void." *Id.* However, this rule is tempered somewhat by the fact that New Mexico does not take a strict view regarding compliance with statutory notice requirements. Instead, whether notice is adequate depends on "whether notice as published fairly apprised the average citizen reading it with the general purpose of what was contemplated." *Id.* at 459, 575 P.2d at 1344. Because the published notice did not adequately describe the location of the property or the nature of the changes proposed, the Court agreed with the district court that the notice was not adequate, concluding that "[b]y failing to follow statutory procedures, due process of law was violated." *Id.*

As a preliminary matter, we note that Protestants contend that their argument is not directed to due process, but instead to subject matter jurisdiction.

> [Protestants] do not claim that they were denied due process because of inadequate notice. [Protestants] assert that neither the State Engineer nor the district court had jurisdiction to approve actions that were not contemplated or contained in the notice that was published. It is a jurisdictional argument, not a due process complaint.

8

This argument misunderstands *Nesbit*. It is true that the *Nesbit* Court held that inadequate notice could deprive an agency of jurisdiction to act. However, as the reasoning in *Nesbit* makes plain, this is because inadequate notice violates due process. In *Eldorado at Santa Fe, Inc. v. Cook*, we summarized the rule from *Nesbit* as follows: "[T]he failure to follow statutory procedures is a due process violation and renders void all subsequent acts of the state engineer." *Eldorado at Santa Fe, Inc.*, 113 N.M. 33, 37, 822 P.2d 672, 676 (Ct. App. 1991), *abrogated on other grounds by Goodloe v. Bookout*, 1999-NMCA-061, 127 N.M. 327, 980 P.2d 652. Simply put, a statutory notice argument is a due process argument—albeit one with its own specific set of standards. Accordingly, we construe Protestants' brief in chief to argue that, under *Nesbit*, the notice published by Applicants was not adequate to apprise an average citizen that the State Engineer might grant the rights that were granted, and that therefore the State Engineer was without jurisdiction to make those changes.

Having thus construed the issue, we may now state the applicable standard of review. Whether due process rights were violated is an issue that we review de novo. *See Maso v. N.M. Taxation & Revenue Dep't*, 2004-NMCA-025, ¶ 18, 135 N.M. 152, 85 P.3d 276, *aff'd* 2004-NMSC-028, 136 N.M. 161, 96 P.3d 286. "In order to meet the statutory requirement of adequate notice, it must be determined whether notice as published fairly apprised the average citizen reading it with the general purpose of

9

what was contemplated." *Nesbit*, 91 N.M. at 459, 575 P.2d at 1344. Notice is inadequate if it is "ambiguous, misleading or unintelligible to the average citizen." *Id.* A minor defect of notice will not invalidate agency action so long as there has been "substantial compliance with the statutory notice provisions [that] would satisfy the purpose of the statute." *Id.* at 457, 575 P.2d at 1342.

The identification of the ten-acre section for the move-to point was adequate to fairly apprise the average citizen with the general purpose of what was contemplated. Protestants take the position that because the application was specific to the Tony Griego Ditch, it did not provide adequate notice that the State Engineer might allow pumping from another location. However, the notice is required only to apprise citizens of the general purpose of the application. Here, the general purpose was the pumping of water from the identified ten-acre section to irrigate Tract Ten. The published notice apprised the public of that purpose. The hearing officer found that the Tony Griego Ditch was subject to litigation between Applicants and the Griegos. Apparently concerned by this, the hearing officer added the alternate pumping location in the Gurule Ditch "in the event that [placement in the Tony Griego Ditch] is determined inconsistent with or precluded by court determination." The Gurule Ditch diverts within the same ten-acre section, and no other diversions exist between it and the Tony Griego Ditch. Unlike the Tony Griego Ditch, there is no litigation

involving the Gurule Ditch because there are no other users of the ditch. Indeed, the Gurule Ditch is entirely contained within Applicants' property. Providing an alternative intake point on the Gurule Ditch solves the potential problems that could arise out of the ongoing litigation that was revealed during the hearings. Accordingly, inclusion of the alternative was not a violation of due process, but a result of it.

The published notice for the Pond application was also adequate. As we understand Protestants' argument, they claim that the published notice was inadequate because it did not request a change to the point of diversion. But Applicants were not requesting, nor did they receive, a change in diversion. The issued permit retired existing rights in order "to offset the initial filling and annual evaporative losses" of the pond. The published notice indicated that the 1.94 afy were to be "removed from irrigation," and that the new place and purpose of use was to be transferred to the pond. We hold that this notice substantially complied with the statutory requirements by apprising an average citizen the general purpose of what was contemplated.

**B.    Historic Supply**

Protestants' next argument is that it was error for the district court to presume, in the absence of a water study, that the historic supply of water on the Rio Tusas was 100%. Protestants proffer three reasons for this: (1) that finding of fact number 13,

11

which finds that a 1999 survey of the Rio Ojo Caliente was not applicable to the Rio Tusas, was not supported by substantial evidence; (2) that the district court gave undue deference to the State Engineer; and (3) that the district court's application of a presumption violated Rule 11-301 NMRA. The State Engineer counters that Protestants waived their sufficiency argument by not summarizing or citing the evidence supporting the factual findings. The State Engineer chose not to address Protestants' second two arguments.

Protestants have not preserved their legal arguments about undue deference or Rule 11-301. Although Protestants cite to pages 197, 321, and 334 of the record proper for preservation, the only relevant statements in these pages are the assertions that it was improper for the district court not to decrease Applicants' water rights by finding a historic usage of less than 100%. No mention is made of undue deference or of the rules of evidence. Furthermore, we note that our review of the transcripts did not reveal evidence of these arguments. Since the arguments regarding undue deference and Rule 11-301 were not raised below, we will not address them for the first time on appeal. *See In re T.B.*, 1996-NMCA-035, ¶ 13, 121 N.M. 465, 913 P.2d 272 ("[W]e review the case litigated below, not the case that is fleshed out for the first time on appeal."). However, to the extent that Protestants' argument that the district

court gave undue deference to the State Engineer, we address the issue in the next section.

Protestants' most cogent argument is that "failure to reduce the amount of water available for diversion and use at the move-to sites to the amount historically available for use at the move-from locations . . . would increase chronic shortages to downstream users, thereby impairing those users while being contrary to the conservation of water." Protestants cite to no New Mexico case or statute discussing historic supply, and we can find none. However, to the extent that the argument about historic supply is directed at impairment and conservation, they have preserved the issue, which we address next.

## C.      Impairment, Conservation, Public Welfare

The majority of Protestants' arguments challenge the district court's findings that the Ditch W and the Pond permits would not impair existing rights, would not be contrary to water conservation, and would not be detrimental to the public welfare. These arguments address the requirements of Section 72-5-23. The State Engineer counters that the district court's findings were supported by substantial evidence.

An appropriator of water may apply to the State Engineer to change the place of diversion, storage, or use of appropriated water. Section 72-5-24. However, this type of change may only be made if it can be done without detriment to existing water

rights, if it is not contrary to conservation of water, and if it is not detrimental to the public welfare of the state. *See* § 72-5-23.

The issues of impairment, conservation, and public welfare under Section 72-5-23 are questions of fact. Thus, we apply a substantial evidence standard of review. *See Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 25, 146 N.M. 473, 212 P.3d 361 (applying a substantial evidence standard where no legal questions remain). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Additionally we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Id.*

**1.     Impairment**

Protestants offer several arguments contesting the district court's finding that the permits would not impair existing water rights. Specifically, they argue that: (1) pumping impairs existing rights because pumpers do not share in shortages, (2) failure to conclude that historic supply was less than 100% and reduce the water use in the

14

permits would impair existing rights, and (3) changing the type of use of a given quantity of water from ditch irrigation to the use of efficient sprinklers would impair existing rights. Most of these advance their views that the evidence presented at trial should have led the court to a different result. We do not reweigh the evidence on appeal. *See State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Instead, we examine whether the district court's finding that existing water rights would not be impaired is supported by substantial evidence.

First, Protestants argue that pumping impairs existing rights because pumpers do not share in shortages. The district court found that by placing the pump intake in a ditch, Applicants would share in shortages because "there could be no pumping from the ditches if the water level on the river was too low to allow the water to flow into the ditches." Even so, if the intake is located in the Tony Griego Ditch, there is the possibility that it might interfere with the Griegos' rights in that ditch. However, Mr. Sterman Buck Wells, a water resource specialist at the State Engineer Water Rights Division, testified that the flow through the Tony Griego Ditch is three acre-feet per day, more than adequate to support both Applicants' and the Griegos' needs. Furthermore, the district court found that Applicants would not be increasing their water usage. Also, the permit is subject to thirteen conditions, including: (1) that the pump will not be used to the detriment of existing water rights, (2) that several

15

measuring devices should be installed, (3) that usage from these meters must be submitted to the state engineer each month, and (4) that the State Engineer shall retain jurisdiction over the permit to ensure compliance. Accordingly, the district court's finding that pumping would not impair existing rights is supported by substantial evidence.

Second, Protestants repeatedly argue that the court should have used a historical supply value from a study of a different river to reduce Applicants' water rights. Protestants cite to no authority requiring the State Engineer to reduce the permitted use based on historic supply. Instead, they argue that, to the extent that findings of fact numbers 13 and 14 imply a finding that the historic supply in the Rio Tusas was 100%, those findings were not supported by substantial evidence. Protestants connect this to legal authority by suggesting that if historic supply is less than 100% then failure to reduce water rights will cause impairment.

Assuming that the State Engineer is required to reduce water usage based on findings of historical supply, Protestants' argument nevertheless fails because findings 13 and 14 are both supported by substantial evidence. Finding 13 declines to apply the Rio Ojo Caliente study to the Rio Tusas because of differences in the geological and hydrologic characteristics of the two rivers. Mr. Wells testified at length about historical supply. Wells noted that no study had been made of the Rio Tusas. In

16

particular, he explained numerous differences between the Rio Ojo Caliente and the Rio Tusas that made it inappropriate to assume that the findings of the Rio Ojo Caliente study were applicable to the Rio Tusas. Finding 14 takes note of the State Engineer's policy of assuming a full historical supply on the Rio Tusas. Wells testified that this is in fact the current practice of the State Engineer.

Of course, even if the district court had made a different finding of historic supply, there is no reason that a finding of less than 100% historic supply and a finding that existing rights will not be impaired cannot both be supported by substantial evidence. As we have discussed, there is substantial evidence to support the district court's findings that, under the current supply conditions, the permits do not impair existing water rights. The historic supply argument does not help Protestants.

Protestants' third argument is that the increased efficiency of sprinklers requires the State Engineer to reduce the amount of water Applicants are entitled to in order to avoid impairment of existing rights. No authority is cited requiring a permit to restrict an applicant's water rights if the application proposes using more efficient irrigation techniques. Indeed, Wells testified that he was unaware of any time this had ever occurred. Wells also testified that the amount of water approved in an application could be based either on the delivery requirement (which is based on a

17

consumptive irrigation requirement but assumes a 40% efficiency characteristic of ditches) or the consumptive use (which is based on the consumptive irrigation requirement but uses the efficiency of the new use) depending on the circumstances. Regardless, as we have already explained, substantial evidence supports the district court's finding that rights will not be impaired.

**2.      Public Welfare**

Protestants make three arguments directed to public welfare: (1) that pumping is detrimental to public welfare; (2) that the pond itself is detrimental to public welfare; and (3) that the necessity of monitoring the pump's water meters and Applicants' history of non-compliance will require "intensive oversight" which is contrary to public welfare.

Protestants first argue that pumping is detrimental to public welfare. To make this argument, they characterize the issue of public welfare as one of fact, and argue that the district court's conclusion is contrary to its other findings of fact. Although the State Engineer identified this as a substantial evidence question, he responds to it as a question of law. Nevertheless, the State Engineer's response directs our attention to district court findings providing substantial evidence to support the finding that the approval of pumping in this permit is not detrimental to public welfare. First, the district court found that because Ditch W is not a community ditch or acequia,

18

allowing pumping does not threaten acequia culture. Second, the district court noted that the permit imposes significant conditions to protect the environment. Finally, the district court found that the new permits do not increase the amount of water Applicants can use.

Protestants' argument that the pond is against public welfare and contrary to water conservation is at best an invitation for this Court to reweigh the evidence. The argument consists of two paragraphs. The first paragraph recites evidence that Protestants believe supports a finding opposite of the finding made by the district court. On review for substantial evidence, we may disregard evidence and inferences contrary to the result below. *See Weidler v. Big J Enters., Inc.*, 1998-NMCA-021, ¶ 30, 124 N.M. 591, 953 P.2d 1089. The second paragraph is simply a conclusory statement that, because the water supply to the pond cannot be controlled by the State Engineer, the pond is both contrary to the conservation of water and detrimental to public welfare. This argument has not been developed sufficiently to allow us to consider it. *See Summit Props. Inc. v. Pub. Serv. Co.*, 2005-NMCA-090, ¶ 35, 138 N.M. 208, 118 P.3d 716. In any event, Wells testified that the water rights that were retired in order to support the pond were more than enough to offset the initial filling and evaporative losses. The district court's conclusions were supported by substantial evidence.

We are similarly unpersuaded by Protestants' contention that the permits will require "intensive oversight" and that they are therefore detrimental to public welfare. This argument rests on three unsupported premises: (1) that administration of a pump requires intensive oversight; (2) that Applicants will be noncompliant in the future, thus requiring intensive oversight; and (3) that anything requiring intensive oversight is detrimental to public welfare. Protestants point to Mr. William Miller's testimony that water meters would need to be monitored as proof that intensive oversight would be required. However, Wells testified that he currently administers numerous pumps. While having to read meters potentially increases the State Engineers' workload, the detriment to public welfare, if any, is offset by having actual data about water usage. Since ditches are generally unmetered, metered pumps would appear to be superior by this standard. Furthermore, whether Applicants are likely to be noncompliant in the future is a credibility assessment that we will not reweigh on appeal. Finally, as Protestants cite no authority for the premise that activities requiring intensive oversight are detrimental to public welfare, we assume none exists. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984).

**3.     Ability to Irrigate from Ditch W**

Protestants make one additional argument in this section that, although not directed to Section 72-5-23, is a similar question of substantial evidence. Protestants

argue that the district court's finding that Applicants were unable to irrigate from Ditch W was not supported by substantial evidence. We note that this argument seems to contradict their arguments about impairment, which are premised on the idea that transferring rights from Ditch W would result in less water being available for downstream users. The contradiction is immaterial, however, as the argument fails.

Protestants cite to no authority for the proposition that Applicants were required to show that they were unable to pump from Ditch W before the State Engineer could approve a change to pumping, and we therefore assume that none exists. *See In re Adoption of Doe*, 100 N.M. at 765, 676 P.2d at 1330. But this argument would fail even if it were supported by authority. The hearing officer found that Applicants "ha[d] demonstrated that they are unable to irrigate Tract 10 from said ditch." Applicants testified that this was the case. The State Engineer's water administration expert, who had personally observed Ditch W, also noted that he "was [not] very impressed by [D]itch W, because . . . it had the appearance of possible abandonment" and there "was [not] very much conveyance area in the ditch." Under the substantial evidence standard, this was sufficient to support the finding that Applicants were unable to irrigate from Ditch W.

**D.      Increasing Burden on the Tony Griego Ditch**

21

In the section of their brief dealing with Section 72-5-23, Protestants make the apparently unrelated argument that the State Engineer did not have authority to increase the servitude of the Tony Griego Ditch. The State Engineer responds that this argument was not preserved.

"To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987). A passing reference is not enough; the party claiming error must have raised the issue below clearly. *See Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 25, 133 N.M. 669, 68 P.3d 909. We will not search the record for preservation, and "[a]bsent . . . citation to the record or any obvious preservation, we will not consider the issue." *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273.

In their brief in chief, Protestants make blanket cites to a sixteen-page span of their proposed findings of fact and to a five-page span of their post-trial brief that they claim preserved this issue. We do not doubt that, in some circumstances, citation to a large span of pages could preserve an issue. However, in this circumstance, virtually nothing in those twenty-one pages has anything to do with the issues appealed. We do not believe that citation to a large span of pages for only a few sentences

"*specifically* point out where, in the record, the party invoked the court's ruling on the issue." *Id.* (emphasis added). We take this opportunity to encourage counsel to provide *specific* citations to where in the record an issue is preserved. Where, as happened here, a party cites to a very large page range for a very small number of sentences, that party effectively invites this Court to search the record. By providing citation to specific portions of the record, parties can avoid the risk that we will decline that invitation.

Protestants do a significantly better job in their reply brief, where they identify four specific portions of the record they believe preserved this issue. First, Protestants point to their Pre-Trial Order, where they stated "the State Engineer's decision to grant this application will work to [Protestants Griegos'] detriment [because] the burdens of the existing co-tenancy arrangement on the Tony Griego Ditch will increase." Additionally, Protestants requested a conclusion of law that "allowing a change in point of diversion . . . increases the burdens on . . . the Tony Griego Ditch." The reply brief also references a separate proposed finding of fact noting that a separate district court case involving the "proportionality of the burdens" between Applicants and the Griegos on the Tony Griego Ditch. Finally, Protestants point to a comment the district court made in overruling a relevancy objection to a question about the extent of the State Engineer's jurisdiction.

23

On appeal, Protestants have framed this issue as a statutory argument. First, they contend that, pursuant to NMSA 1978, Section 72-9-2 (1907), both the State Engineer and the district court lacked jurisdiction because they have "no authority over distinct and separate ditch ownership rights." Second, they contend that approval of the permit (as opposed to installation and use of the pump) violates NMSA 1978, Section 73-2-7 (1882), which requires consent from a majority of owners when the usage of the water changes. Protestants go to some lengths to make it clear that this is not an argument about water rights, but instead about property rights in the ditch. Accordingly, we understand this argument to be directed not at Section 72-5-23, but at Sections 72-9-2 and 73-2-7.

With this in mind, we turn to the four statements Protestants claim preserved their argument. In their Pre-Trial Order, Protestants mentioned a detriment to the Griegos due to increased burdens on the co-tenancy in the Tony Griego Ditch. We note that no authority is cited on the page that this statement appears—in particular, the order makes no mention of Section 73-2-7—and that its generic language could refer to impairment, equity, or could just be argumentative. We do not believe that this comment was sufficient to alert the district court to the need to make a ruling on Section 73-2-7. Of course, as the comment has nothing to do with jurisdiction, it could not have preserved the Section 72-9-2 argument. The similar comments

Protestants point to in the proposed findings of fact and conclusions of law suffer the same defects.

Protestants also direct our attention to the district court's comments regarding a relevancy objection. Protestants attempted to elicit testimony from Wells, to the effect that the State Engineer's jurisdiction did not extend to ditches. The district court viewed this as a legal conclusion and sustained the objection. The court sustained several more similar objections before counsel stopped trying to elicit this testimony. This topic is related to Section 72-9-2, but is in no way related to the argument on Section 73-2-7. However, counsel's attempt to elicit a legal conclusion from the expert did not invoke a ruling from the court on the substantive issue, but instead invoked a ruling on admissibility of the testimony. Protestants point to nowhere else in the record where such a ruling was fairly invoked. Accordingly, neither of the two arguments made on appeal were clearly presented below, and we will not address them for the first time on appeal.

## III.   CONCLUSION

For the foregoing reasons, we affirm and remand for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

25

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**CYNTHIA A. FRY, Judge**